My name is Roger Topham. I'm here for Plaintiff Appellant Ronnie Alexander. My top priority here today, by the way, is just to answer whatever questions you have. I think that's one of the most important things of oral arguments and a good opportunity for that real-time engagement that you don't normally get. And this case has a lot of content to it. I won't be able to cover the whole thing, so I'm going to rely on the brief for a lot of it. But I do want to talk about, first, just the mechanics of applying the Bell Test and how it is applied in this case. And then I'd like to talk about the second and distinct unlawful condition of confinement, which is the total lack of any kind of mental health care. And then if there is time after that, I'd like to talk briefly about individual liability. Those are the items I'd like to focus on. Convicted prisoners, of course, as we all know, they have their rights protected by the Eighth Amendment's prohibition of cruel and unusual punishment, whereas pretrial detainees, on the other hand, because they've not been convicted, their rights are conferred by the Fourteenth Amendment's due process clause. And the Supreme Court has stated repeatedly that there's a big difference between those two and that pretrial detainees simply cannot be punished at all. And this is consistent with the touchstone of the Fourteenth Amendment substantive due process rights, which is that as a general matter, a government actor cannot exert authority over someone without a legitimate governmental purpose. That's the central proposition of the Fourteenth Amendment substantive due process right. Applying that to pretrial detainees, the Supreme Court first stated its test for how that applies in Bell v. Woolfish, 1979, which is essentially a three-step process. Step number one, was there an intent to punish? If you can infer an intent to punish, you can also infer that the governmental, I'm sorry, if you can infer an intent to punish on the part of the government actor, you can infer that the condition that was imposed was unconstitutional. And this court has recognized this in Hamilton v. Lyons, as well as Parker v. Carpenter, and I'm sure other cases as well. Here, there's replete evidence that the intent of the jail and the guards was to punish Mr. Alexander. Before he even made any kind of comments about that he might hurt himself, he had asked repeatedly to be moved from his cell because he was being threatened by his own cellmates. He told guards that they were threatening to kill him, they were threatening to seriously hurt him. He stated that over and over again. And of course, the defendants like to ignore this fact, but jailers have a general duty to protect inmates from violence from other cellmates, as well as self-harm. So when these guards told him, no, we're not going to move you, even though you have clearly expressed to us a reasonable fear for your safety, they violated his rights by doing so. That by itself is evidence of a hostile animus towards Mr. Alexander. It cuts against the defense's position that when the guards put him in a violent cell, they were merely doing so because they were so concerned that he might hurt himself. Well, what was that concern when he was complaining about his cellmates threatening his life? And moreover, it cuts against any idea that they might have reasonably believed that he was suicidal, because a person who moments ago was loudly complaining that he was scared for his life from threats by his cellmates is probably not going to suddenly two minutes later decide he wants to kill himself. It just doesn't make sense. It's not a reasonable inference. They knew he was lying. And this was evident when he did, you know, they sort of forced his hand, and he believed that the only way out of this situation, the only way to protect himself was to say the only thing that could come to his mind to sort of get him out of there, which was that he might hurt himself. So he told that to the guards, and then they say, okay. And as they're walking him down the hall to the violent cell, one of them, they repeatedly use vulgar epithets against him, calling him the B word over and over again. They say, you really effed up now, B. Can't get much clearer of an express intent to punish than that. It's certainly not an expression that they're concerned about his safety. Counsel, can we unpack the events? Let's walk through them a little bit more slowly.  So when Mr. Alexander says, you know, my cellmates are threatening me, is it your position that that alone, what I heard you say earlier, that alone requires him to be moved to a different cell? No, perhaps. I have, you know, that isn't really part of this claim. I'm sorry, I thought you just told me that that alone was evidence of an intent to punish because he said, my cellmates are threatening to hurt me and kill me, move me. And you said that alone, the fact that they didn't do it, that is sufficient for your claim. Did I misunderstand what you said earlier? I'm not sure that that just by itself would be sufficient. Part of the totality of the circumstances, I think it contributes to the evidence that they had an intent to punish him, that they had a hostile attitude towards him, that they were not interested in his safety in any way. What would be your authority for that? What would be your authority for the idea that an inmate who says, I need to be moved, things in here are bad, people are saying mean things to me, what would be the case, and I'm happy to take a case from any court in the country, doesn't have to be in the Fifth Circuit, doesn't even have to be a court of appeals, I take a district court case that says an inmate is saying, I'm scared, I don't want to be in here, I need to be moved, that that's sufficient to require a movement? Well, I don't have a case off the top of my head for that. Okay. All I know is that, you know, the general standard for, is that it has to be a reasonable threat. And what would be the basis of thinking it's reasonable? Are they supposed to do like an investigation, do interviews, like how would they differentiate people talking inside of a cell from a reasonable, good-faith fear of your life? Because I think probably everybody would agree that a reasonable, good-faith fear of your life is a sufficient source of cause or concern. But I guess my question for you is, what is the distinction between, hey, get me out of here, and the latter, that is like a reasonable, well-grounded fear? Well, honestly, I don't have an answer for you. Then how are the jailers supposed to know? I'm sorry? If you can't answer my questions, how is the jail supposed to know? Because we have the benefit, we're obviously in a very safe room right now, we're just a bunch of lawyers talking and, you know, we've got all the safety in the world and there's no press on us at all. How is a jail supposed to know in the sort of commotion of the situation how to do right by your client if you can't answer my questions today? Well, simply, I've never had a failure to protect claim in that type of situation, so I'm just not familiar with the case law. Let's do a different one. But I'm not arguing that they specifically violated his constitutional rights at that moment. I'm not taking a position whether they did or not when they refused to move him. Okay. I'm sorry, please, I didn't mean to interrupt. All I'm suggesting is that, I mean, I think anything they say, anything they do can be part of the totality of the circumstances that a court should examine when asking itself is there any evidence here that would suggest an intent to punish? And all I'm suggesting is that their refusal to consider his, to move him, can be considered a hostile animus towards him and a lack of concern for his safety. So after that you said, well, they should have known he was lying about the suicidal ideation because he just a few minutes earlier had said, get me out of here, my cellmates are being mean, are saying these terrible, hateful, mean, hurtful things. What would be your authority for the idea that a jail can hear an inmate express suicidal ideation and ignore the complaint? Well, I mean, I think these are two sides of the same coin. If the simple comment that my cellmates are threatening to kill me is not enough to trigger a reasonable belief that they might actually do so, the simple statement that I might harm myself by itself also may not trigger the constitutional requirement that they take some steps to protect against suicide. Especially, again, given the context of the totality of the circumstances, they knew that this person had just seen the mental health staff person that very day, only a few hours earlier, and she had found no issues with him. Although at that time he did self-report depression, or am I incorrect about that? He did self-report anxiety and depression, true. But he did not, on the initial intake form, there was no indication of any kind of suicidal ideation, he denied it. He had already been in the jail for several days, he had seen the mental health staffer twice, and on both her reports she noted no concerns with his mental health. And again, it's just sort of incongruous that a person would, in one moment, be afraid that the cellmates were going to kill him, and then suddenly take a 180 and be very highly motivated to die. That just doesn't make any sense. But again, all this, I'm only suggesting that it is taken as part of the totality of circumstances and trying to figure out what their actual intent was when they put him in the violent cell, because that's the critical question here. If there is an intent to punish, nothing else really matters. Once you see there's an, if there's any way to infer an intent to punish, it is a constitutional punishment. And so, those are just some of the facts. The rest of the facts, again, are these comments made to him while he's being escorted down to the violent cell, and again, you really effed up now. I don't know how much clearer of an intent to punish there can be than that. But beyond that, in the five and a half days that he was in the cell, they, you know, and when I say they, I mean all seven of these individual correctional officers who were responsible for the oversight of that cell over the period of those, however many shifts there was, 11 or 12 shifts, they repeatedly denied his request for water without any reason to do so. And when I say repeatedly, I mean virtually every single time. He was constantly asking for water, and over the period of five and a half days, they only provided him any water on three occasions, a little cup of water over five and a half days, other than with meals. They never gave him any toilet paper, ever. He repeatedly asked for toilet paper. They never gave him any, not even a few squares. Over five and a half days, he repeatedly asked for an opportunity to use some kind of, you know, any element of basic human hygiene, take a shower, use a regular toilet, use a sink, wash his hands, brush his teeth, anything. They wouldn't let him do any of that, even with supervision. And so I think that's a key fact. Is that different than the way suicidal inmates are generally treated in Henderson County? I mean, I can understand your point, and like, obviously, these are not ideal conditions, but dealing with suicidal inmates, I mean, respectfully, our court sees this with, tragically, some regularity, and I'll just tell you that your friends from the bar who represent those clients, when they have a fact that says, look, my client showed up, and he said, I was depressed, and I was, you know, as Judge Douglas asked you, right, in the intake form, he is self-identifying with certain mental health conditions. The fact that there are two nurses who look at him, that's just evidence of deliberate indifference. And then if, heaven forbid, something happens in the jail cell, that's an Eighth Amendment claim, and we see them. And so what I'm asking is, the jail has to deal with our precedents that say, you have to take, you can't give them blankets, can't give them stuff where you can self-harm, whether that, whatever, furniture, toilet, sink, glass, razors, all kinds of things that one can use for self-harm. So my question is, are those sorts of things that are being done in this jail to your client, Mr. Alexander, are those different than were being done to other inmates with suicidal ideation? Well, I don't, and this is just a 12D6 pleading. And I'm asking if you put it. I don't necessarily know what happens to all of the inmates in there. I do know that they have testified in deposition that sometimes they will put suicidal inmates in what they call a separation cell, which is a solitary cell that does have a bunk and a toilet and a shower and a sink and a desk. So they will sometimes use that. I know also their official written policies state that when someone is initially identified as having some potential for self-harm, there are, the violent cell is the most extreme option. The separation cell is the second most extreme option. And the least extreme option is to simply leave them in general population with 15 minute observations. So, yes, there are, according to official jail policy, whether they follow it or not, the official jail policy recognizes that not everyone needs the extreme deprivations of the violent cell. Very good, counsel. Thank you. We saved time for rebuttal. You're welcome. We'll hear next from Mr. Davis. May it please the court, counsel. Your Honors, the question was actually asked by the court, but I want to reemphasize it. What is a legitimate governmental interest in this case that warranted restrictions? And I'd like to quote from Judge Dennis' dissenting opinion in Cope v. Cogdell. Pre-trial detainees have a 14th Amendment right to be protected from a known risk of  abatement. If an inmate faces a substantial risk of serious harm, a correctional officer who disregards that risk is failing to act or fails to take reasonable measures to abate is guilty of deliberate indifference. And I think in a case usually cited by plaintiffs, Justice Goldberg, Judge Goldberg stated, employing only meager measures that jailers and municipalities know to be ineffectual amounts to a deliberate indifference. What's the justification for the failure to provide toilet paper and water, specifically? Yes, Your Honor, water was provided. It was provided three times a day with meals. There were a few other occasions when water was also provided, extra water. The problem is, Your Honor, anytime that you allow something else to go into that inmate's cell. I mean, ideally, you don't have anything in there that's not absolutely necessary. An inmate can use bits of styrofoam. An inmate can use toilet paper to suffocate himself. And similar things have happened. It's like in jail settings. They've also been used as weapons. But enough toilet paper doesn't actually take that much. That's hoarded. Or cups that are hoarded and the rest of the staff doesn't know to pick up after the meals can be used to injure that inmate. It's just like with the above ground toilet in that cell, Your Honor. If you have an inmate who has expressed and said, I'm going to kill myself, and you look at that inmate's records and it says he's depressed and he's suffering from other things like anxiety. That's a serious situation. And the jail can't ignore that. And if you have jailers that on their own allow this inmate to have other things than what he's normally allowed, three meals, water, every day. If you allow and check by medical, check by mental health. He was on a detox program, so he was receiving his detox medications. He was seeing medical staff. We follow the advice of medical staff and we follow the advice of psychological staff. If they had noted that he needed water, we certainly would have provided more water to him. But we should not or jailers should not, of their own discretion, start giving that inmate any extra items because there's just no way to account for it at the end of the day. You can't have an above ground toilet because inmates have drowned themselves in those toilets. And I've cited cases to the court, Your Honor, that reflect that, Fifth Circuit cases. Same with a sink, Your Honor, where they've drowned themselves. Same with a shower where they've hung themselves or used a small sill to drown themselves. Suicide really is, Judge Dennis and Judge Goldberg were absolutely right. Suicide in a correctional facility is one of the most dangerous things that our counties and our prisons face because so many of the people there have mental health issues and so many of those people suffer from depression and anxiety and have suicidal ideations. And Henderson County learned that lesson a long time ago, Your Honor, and they're going to take the most stringent steps possible to guard the safety of those individuals. And I'm not just saying that, Your Honor. They put those policies in place because they were the defendants in 1982 in the case that Judge Goldberg was in, the Ryan v. Henderson County case, 973 of 2nd, and his quotation that I was citing is at 396. Suicide is a real threat in the custodial environment, and Henderson County took note of that. And Henderson County tries very, very diligently, Your Honor, to live up to that warning that was given to them. On the other side, I say that there was a middle ground available. There was either leave them in the cell, put them in a violent cell. I can't recall what you said the middle option was. Yes, Your Honor. So if there are enough suicidal inmates and there's space, and if on the jail intake forms that are approved by TCOL, if the inmate doesn't say, I'm going to kill myself, but if the inmate just notes the fact that in the past 30 to 60 days he's felt hopeless, that's enough under Texas jail standards to where you have to put him on suicide watch. If you have enough people who identify that way, and there usually is, then you can put all those people in a tank together. But the tank also has problems, Your Honor, because those inmates all collect things. They all have different items. And ideally with somebody who says, I'm going to kill myself, and has self-reported a psychological history that supports that, you want to put them in an environment where they can't have access to any other inmates, get anything else from any other inmates, get into an altercation with any other inmates, beat their head against the toilet or a shower stall. This is one of the more extreme situations, Your Honor, because you've actually got an inmate who says, I'm going to kill myself, and then it's supported by his own documentation. So the staff took it seriously and went by the rules. And our jail staff, they're not medical, they're not psychiatric. They have to act like a reasonable person would, a reasonable correctional officer in that same or similar situation. And if they had been told at any point by medical or by the psych lady to give the guy more water or better take him out and give him a shower, they're going to. But unless that occurs, Your Honor, it's dangerous to move an inmate like that around the facility because of the things that he can do to himself and the things that he can get from other inmates where he can hurt himself. And as the district court noted, Your Honor, in this case, we're very fortunate it worked. The restrictions worked. He did not kill himself. And the very idea that this court would tell everybody in the Fifth Circuit, you can have an inmate that says he's going to kill himself, who self-reported depression and anxiety, and you can just say, oh, I don't believe that. I'm a detention officer. I just don't believe that. So I'm just going to leave you here. This court can't do that. It would go against every precedent that you all have, and it would create havoc, chaos to the jails that are trying to do the right thing by having policies like this. Your Honor, the things that are involved in this case are not extreme deprivations. Yes, it's unpleasant not to have toilet paper. Well, if you're going to give them toilet paper, then are courts going to tell the jail staff, who are supposed to be given great deference in terms of correctional minutia, are we going to start saying, okay, he gets two sheets of toilet paper? What if he needs more? What if he collects enough to where he shoves it down his throat and kills himself? Then we're going to be liable. And if it's not according to policy and you have detention officers that are discretionarily giving an inmate stuff, that's where you get in trouble. As far as the claim of an excrement-filled cell, they attach the picture of the cell. You can see what the environment was. It's not a bad environment. I mean, it's not pleasant to have a bathroom that's in the middle of the cell that you have to flush, but it's better than having a toilet that you can beat your head in with or drown yourself in. And what each of the individuals did, they did every 15-minute check. They didn't miss a single check. They provided him with all his meals and with all his water. They did everything that they were required to do, and the plaintiff agrees to that. Yes, they did. They did all that. I don't think any of these things create deliberate indifference or show deliberate indifference to a substantial risk of serious harm to this inmate. There just wasn't one. If there's any questions, I'd be glad to answer your questions, Your Honors, but I think with that, I'll yield my time to other counsels. Very good. Thank you, Mr. Davis. We'll hear next from Mr. Woods. Thank you, Your Honor. May it please the Court. I'm mainly here to address some specific issues, the deal with Taft. Are you Mr. Taft? Sorry? Josh Woods, Your Honor. Josh Woods, Your Honor. I represent Taft and his PLLC. I'm mainly here to address some Taft-specific issues, but I'd like to begin by affirming many of the arguments that my co-counsel or counsel for co-defendant has made and pointing out that this Court has on multiple occasions held that the Bell test is deferential to jail rulemaking and has described it as essentially a rational basis test. So I think it's well established here that all of, especially all of the official conditions of the violent cell, have a rational basis to the very important goal, as we've heard today, of preventing suicide. In addition, though, this Court should affirm the dismissal as to the Taft defendants because the Taft defendants had no hand in causing Mr. Alexander to be confined in the violent cell. So the violent cell, it's specifically alleged in the pleadings, and this is a quote, that the violent cell is a trap from which the only escape is at the discretion of the guards. So in addition to all the reasons we've heard, Taft defendants cannot be held liable in this case for the simple fact that they could not release and had no hand in placing Alexander in the violent cell. It's further alleged that jail officials put Alexander in the violent cell without consulting Taft or Flips and that by default all suicide risks are placed in the violent cell. We heard a little bit about deviations from that policy, but those are all, again, at the discretion of jail officers without the involvement of Taft or Flips, his employee at the jail. In fact, I heard you, Judge Douglas, to ask about some of the conditions with some skepticism that they were related to suicide prevention, but none of those conditions are attributable in any way to the Taft defendants. In fact, there's no attempt made to tie the Taft defendants to any denials of requests, so obviously all requests went through a central officer who didn't report to Taft, and Flips was not in the same chain of command. So all denials of requests for toilet paper, for showers, for additional water, they cannot be attributed in any way to the Taft defendants. Further, there's no allegation that the Taft defendants were privy to any intentional punishment. I know Plaintiff's Counsel has focused a great deal on allegations of intentional punishment. To the extent the court is inclined to rule on that basis, it should nevertheless dismiss the Taft defendants because there's no attempt even to argue that the Taft defendants intentionally punished. And the allegations are even clearer that although Flips is alleged to have knowledge of some of the facts that are supposed to put her on notice of intentional punishment, it's specifically alleged she never conveyed those to Taft. And of course there's no vicarious liability available in this context, and they've stopped pressing any vicarious liability claims on appeal. Finally, I'd like to move on to a final point, which is that the state of mental health care here was not independently a constitutional problem. I think if you look at the estate of Henson v. Wichita County, you can see the most closely analogous case that we were able to find, and at the worst the allegations here are analogous to those, and no constitutional violation was found for multiple reasons, including reasons analogous to the arguments we make here. It seems like the argument with regard to Taft that Flips didn't follow through on some of the information that she was given. So what is your understanding of what the constitutional minimum is for mental health care in the jail system? Well, I'm not sure that we have good authority on exactly what the constitutional minimum is. We haven't disputed that there is some constitutional minimum in the abstract. We're quite confident that we reached that minimum in this case. I would note that if you're concerned that Flips' conduct didn't live up to the constitutional minimum, Taft cannot be held vicariously liable. The only thing approaching vicarious liability that's available in this context under this Court's precedent is Monell liability, and that would require showing that Taft had some official policy or well-established pattern of practice that was the moving force behind Flips' conduct, and I just don't think there's anything that approaches that here. Plus, for Flips' conduct to be treated as an independent violation, it would be treated not as a conditions of confinement case but as an episodic act or omissions case, which would require showing that she was deliberately indifferent. So at the very least, her conduct has to be measured under a deliberate difference standard, which is just much higher than anything, I think, attributed to her in this case. If there are no other questions, Your Honor, I'll yield time. Thank you, counsel. Mr. Topham, you have 5 minutes for rebuttal. Thank you.  So, again, I just want to emphasize that this is a pleading, and it's a 12b-6 motion. Whether or not there was a punitive intent is an element of the claim, and the allegations are that they had a punitive intent, and we've alleged a number of facts that support an inference of punitive intent. Their suggestion that there was no punitive intent and that the purpose really was to protect him from killing himself is just their assertion. It's an inference that simply can't be drawn at the 12b-6 stage. They can make that argument at summary judgment, they can make it at trial, they can present testimony to that effect or whatever they want to do, but that is not what's been alleged, and assuming that that was the genuine purpose is something that I don't believe the court can do. And I can get a little bit more nuanced than that. In fact, this is not a black-and-white situation where if they made the appropriate decision at moment one, it was still appropriate three days later. So, for example, even if the court were to assume, just for argument's sake, that the initial decision to put him in the violent cell was reasonable because he said that he was suicidal, well, that doesn't mean you can just leave him in there indefinitely, forever, without any further assessment. The same way you wouldn't be able to leave someone in a restraint chair indefinitely, even if there was an initially reasonable purpose for putting a person in a restraint chair. So here, and this ties directly into the problem with the mental health care and Taft, Taft completely abandoned his contracted duty to provide mental health care at the jail. He was the only one providing any mental health care. Instead, he treated it as a get-rich-quick scheme. He was getting $75,000 a year. He put $35,000 or so in his own pocket to do nothing. Subcontracted the entire job out to Jessica Flips, who he paid $40,000 a year, but she was unqualified. She was unlicensed, had maybe a tiny bit of experience, but was unlicensed and under Texas law. A, he cannot use unlicensed people to provide those kinds of services, and B, she... Well, no one without a psychology license can provide psychological services. She admitted she cannot make clinical decisions. The NCCHC standards make it abundantly clear that the use of any kind of solitary confinement, and this is, like, the most extreme kind of solitary confinement, requires engagement with medical and mental health professionals. There was none. He was not being checked by a medical. That is false. He was checked one time by Jessica Flips, but she is not a qualified mental health professional, so it really doesn't count. In other words, what Taft was... He was just pretending to provide mental health care, and he was barely even doing that. It's really just a scam. The whole thing is just a scam. It's illegal under Texas law. Judge Douglas, you asked, what's the constitutional minimum for mental health care, and I agree with Mr. Woods that there's not a clear answer out there. However, I think that at a very minimum it has to conform with Texas law. You can't have somebody providing mental health care who cannot legally do so in Texas. That just wouldn't make any sense. It would be like saying that you can have medical care at a jail that's provided by a team of rodeo clowns or just the lowest level med tech you can find without any physician. Ridiculous. Counsel, in your view, how many times did he need to see a qualified mental health professional? What is your view of the constitutional minimum? In this particular case, I don't know that I have... There's no precedent for it, and so I don't really know. I think this is a question that has been plausibly alleged. I think it's been plausibly alleged that it was insufficient, that you've got to have something. Iqbal Entombly requires you to come forward with a plausible basis of relief. That is, you have to come forward with well-plaid facts to show a constitutional violation. You would presumably, as part of that, need to be able to articulate the legal standard upon which your facts fall short. So you would have to say the constitutional minimum is X and they did X minus Y. That's literally the definition of a plausible claim. You have to know what X is, otherwise you can't have a stated form of relief. I do understand that. Without any appropriate case law defining what the minimum mental health care standard is as far as placing someone in solitary confinement, I don't know how I can come to that answer. I will say that the standards are very clear that within 24 hours, someone who's placed in any kind of solitary confinement is supposed to be assessed by a mental health professional. And that's state law? It's in the NCCHC standards, which are nationally recognized published standards on correctional health care. Does the 14th Amendment require adherence to those private standards? Not precisely, necessarily, but I think they inform what the constitutional minimum would be. I'll give you a sentence to wrap up if you'd like. I'm sorry? You're welcome to have a sentence to wrap up if you'd like. Well, just one last thing. Mr. Davis said that these deprivations just weren't that extreme. My goodness, he was deprived of every imaginable element of human hygiene, which is deprivation of any element of human hygiene is a violation of the 8th Amendment, let alone the 14th Amendment. He was deprived of every single imaginable one for five and a half days. And not only did they not give him water or toilet paper, they could have taken him outside at least to use a shower once a day or once every couple days, could have taken him out to use a sink. He's having to wipe himself after a bowel movement with his hands and then eat with those same hands without washing his hands ever for five straight days. That is an incredibly disgusting deprivation and it's just incredibly dehumanizing on top of being dangerous. Thank you. Thank you, counsel. The case is submitted.